# United States Court of Appeals
## For the First Circuit

---

No. 09-2179

JESUS RAMOS,

Plaintiff, Appellant,

v.

THOMAS R. PATNAUDE, M.D. ET AL.,

Defendants, Appellees.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. George A. O'Toole, Jr., U.S. District Judge]

---

Before

Boudin, Circuit Judge,
Souter, Associate Justice,[*]
and Selya, Circuit Judge.

---

Hector E. Pineiró, with whom Robert H. Beadel, Robert A. Scott, Law Office of Hector Pineiró, and Lizabel M. Negrón-Vargas, were on brief, for the appellant.
Matthew Grygorcewicz, with whom John J. Reardon, Melick Porter & Shea, L.L.P., Raymond J. Reed, Reed & Reed, Jeffrey Rosario Turco, and Law Offices of Jeffrey Rosario Turco, were on brief, for the appellees.

---

May 23, 2011

---

[*]     The Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

**SOUTER**, <u>Associate Justice</u>.  When the plaintiff-appellant, Jesus Ramos, was committed to the Worcester County House of Correction in Massachusetts as a pre-trial detainee on April 4, 2003, he was addicted to heroin, from which he was forced to abstain.  In anticipation of his physical reaction he was given medication at the direction of the defendant-appellee, Dr. Thomas Patnaude, the institution's medical director, according to a protocol designed to mitigate the agony of withdrawal and prescribed by the doctor in thousands of previous cases.  The treatment spanned a three-day period and was repeated twice over the nine days after commitment, during which Ramos was taken on two occasions to the nearest hospital for outpatient and inpatient care that included intravenous fluid for dehydration and exploratory chest surgery.  All told, the following distressing and in some instances threatening conditions were noted: "extreme dehydration, acute renal failure, advanced respiratory distress, subcutaneous emphysema, mediastinal emphysema, presumed esophageal perforation, malnourishment, metabolic alkalosis, hypokalemia, and pneumothorax of the right chest and total collapse of the right lung." <u>Ramos</u> v. <u>Flynn</u>, No. 06-10645-GAO, 2009 WL 2207191, at *1 (D. Mass. July 22, 2009).  These clinical notations do not, however, fully capture the reality of Ramos's account of the course of his withdrawal, being left to lie, as he alleged, in the foul products of chronic incontinence and vomiting, on occasion unprotected from the chill

of cold weather outside as windows were opened to mitigate the resulting stench.

In the aftermath of the allegedly horrific experience, Ramos brought suits in state and federal courts, including the present action, which was originally against seventeen defendants. Under 42 U.S.C. § 1983 he claimed a violation of the Due Process Clause of the Fourteenth Amendment for reckless indifference to his medical needs and, as to some defendants, for failure to train institutional personnel to respond to inmates' medical needs. He also invoked the federal court's supplemental jurisdiction by adding state law tort claims for intentional infliction of emotional distress. The trial court granted summary judgment to the present appellees on all claims, on various procedural and substantive grounds. It held for them on procedure after concluding that Ramos had failed to avail himself of the House of Correction's grievance procedure for raising his complaints and should accordingly be barred from federal litigation under 42 U.S.C. § 1997e(a), a provision of the Prison Litigation Reform Act of 1995 requiring exhaustion of available administrative remedies before resorting to the federal courts, and the court drew a comparable conclusion as to the tort claims under state law. The court nonetheless considered the merits and held that facts not subject to genuine dispute and disputed facts that might be resolved in Ramos's favor failed to show any action or failure to

act going beyond negligence or malpractice to the point of deliberate indifference to substantial risk of serious harm to health, which would be necessary in order to state a § 1983 claim under the Due Process Clause; it drew a comparable conclusion about the state law tort claims, and entered summary judgment for the appellees. On de novo review, Sullivan v. City of Springfield, 561 F.3d 7, 14 (1st Cir. 2009), we affirm.

Ramos brought this appeal only as to five of the original defendants. Subsequently, the number dropped to four, upon removal of the former Sheriff of Worcester County, John Flynn, by agreement, and then down to two, with the dismissal of Correctional Officers Hill and Larame. The only remaining appellees from among the original defendants are Dr. Patnaude and Worcester Internal Medicine, Inc.

I

Further simplification is in order, beginning with the claim against Worcester Internal Medicine, which is totally devoid of evidentiary support in the record. The practice group's only connection with the acts complained of seems to be Dr. Patnaude's membership in it, and that of another physician who sometimes covered for Dr. Patnaude but was not shown to have had any part in the events of this case. Since the group had no contract with the House of Correction, and in any case because respondeat superior is not a channel of derivative liability in a § 1983 action, Whitfield

-4-

v. <u>Melendez-Rivera</u>, 431 F.3d 1, 14 (1st Cir. 2005), the trial judge could not understand why the medical practice group had been sued, and neither can we.

The issues, too, are subject to reduction, beginning with one alternative ground for judgment, the failure to exhaust administrative remedies, which is the subject of a substantial portion of the briefing before us. So far as it concerns the federal claim, satisfaction of the exhaustion requirement of § 1997e(a) turns on whether prisoners at the House of Correction were on notice that complaints about denial of access to medical care were subject to the administrative grievance procedure (as distinct from complaints about the merit of medical care actually rendered, which clearly are not), and on whether Ramos's claims here are about denial of access rather than the quality of treatment. Ramos argues, with color of support, that no such grievance opportunity was made known, and thus aims at reversing both the adverse ruling on exhaustion, and (if he succeeds on that) at vacating the equally adverse rulings on the merits, which he says were beyond the district court's jurisdiction once it held Ramos had failed to exhaust. The appellees counter that failure to exhaust was the correct conclusion, but that the merits ruling was independently within the trial court's power, since exhaustion is not a jurisdictional requirement.

We take a third position, for economy of disposition, in

choosing to bypass the exhaustion issue just because it is not jurisdictional, and because the merits decision is sound, as we will explain. The Supreme Court made it plain in Woodford v. Ngo, 548 U.S. 81, 101 (2006), that exhaustion under § 1997e(a) is not a jurisdictional condition, and has held it to be an affirmative defense, Jones v. Bock, 549 U.S. 199, 212 (2007). Ramos tries to deflect Ngo by pointing out, perplexingly, that the Court there was speaking only of what it called "proper" exhaustion. But the Court used that adjective simply to describe the action that would qualify as exhaustion, to distinguish it from resort to administrative process after the time allowed: a claim barred by time is not "exhausted" by raising it late. See Ngo 548 U.S. at 90-93. So, even on the assumption that Ramos failed to exhaust a House of Correction's grievance procedure that had been made known to him, the district court had, and this court has, jurisdiction to reach the merits. Our choice to consider the merits without working through the exhaustion issue eliminates the further assignment of error that before acting on the summary judgment motions the district court unreasonably denied Ramos further time (requested under Fed. R. Civ. P. 56(f)) to depose a corrections officer, Sgt. Germano, on the scope of the subject matter of possible administrative grievance.

Two other issues may be resolved by brief discussion, these on their merits. Ramos sought to show that his state tort claims for

emotional distress did not suffer from failure to satisfy a state exhaustion requirement, for he moved for certification of the issue to the Supreme Judicial Court of Massachusetts as allowed by Mass. S.J.C. R. 1:03. His argument that it was error to deny that motion is answered by the fact that his brief in this court fails to address the merits of the tort claims, and thus waives any objection to the trial court's conclusion that the claims were wanting in evidentiary support on which liability of any defendant could be based. See Lumataw v. Holder, 582 F.3d 78, 80 n.1 (1st Cir. 2009). Because the merits issue is waived, the related matter of certification is inconsequential.

Waiver by inattention also disposes of any claims against Dr. Patnaude for failure to train or supervise subordinate personnel. See id.

II

What remains is the § 1983 claim against Dr. Patnaude for a failure to provide medical care that amounted to deliberate indifference to substantial risk of serious harm to Ramos as he suffered withdrawal when deprived of heroin. See Burrell v. Hampshire County, 307 F.3d 1, 7 (1st Cir. 2002) (applying the Eighth Amendment deliberate indifference standard to the due process claim of a pre-trial detainee). There is no question that Dr. Patnaude owed a duty to Ramos when acting on behalf of the House of Correction under his contract to serve as its medical

director. But the district court understood the record to show only arguable negligence, with no reasonable possibility of a jury finding that the doctor was deliberately indifferent, that is, that he actually understood that such a substantial risk existed and was actually indifferent to it in failing to take appropriate mitigating action. See Farmer v. Brennan, 551 U.S. 825, 837 (1994) (§ 1983 liability attaches only when the "official knows of and disregards an excessive risk to inmate health or safety"); Feeney v. Correctional Medical Services, Inc., 834 F.2d 9, 13 (1st Cir. 1987) (in cases alleging deliberate indifference to medical risk, "[t]he care provided must have been 'so inadequate as to shock the conscience'") (quoting Torraco v. Maloney, 923 F.2d 231, 234 (1st Cir. 1991)). Dr. Patnaude points to the following undisputed facts as supporting that judgment and barring any reasonable possibility of inferring the culpable state of mind required for a due process violation.

He treated Ramos's withdrawal reaction by following a pharmaceutical protocol he had applied in thousands of instances of drug withdrawal at the House of Correction with overwhelming success over a period of 30 years, a procedure that Ramos's own expert believed to be generally appropriate. During the time Ramos was held at the House of Correction, Dr. Patnaude placed him on so-called medical watch, calling for observation on at least 25 separate occasions by nursing personnel, and the doctor himself

conducted at least one examination. Despite his skepticism that Ramos's continuing complaints were genuine, he twice ordered the nursing staff to repeat application of the three-day drug treatment protocol. He ordered a blood analysis and on two successive days responded to staff reports by ordering Ramos to be taken to the emergency room of St. Vincent's Hospital for examination and treatment. No factfinder, Dr. Patnaude argues, could reasonably conclude he had been deliberately indifferent to a substantial risk of serious harm to Ramos with these undisputed facts in the record.

Ramos attacks that conclusion on several grounds. First, there are claims that the undisputed record shows no specific orders from the doctor requiring prompt action, as in drawing the blood sample (it was not done until the next day) and obtaining test results (which took several days), in reinstituting the treatment protocol and even in requiring speedy arrival of an ambulance to take Ramos to the hospital the second time. Ramos is quite right that a mere formality of some ostensible medical treatment is no conclusive bar to finding constitutional indifference. See Hathaway v. Coughlin, 37 F.3d 63, 68 (2d Cir. 1994); Warran v. Fanning, 950 F.2d 1370, 1373 (8th Cir. 1991); Hunt v. Uphoff, 199 F.3d 1220, 1224 (10th Cir. 1999). He is right again that a jury could conclude that adequate medical care would have shown more promptitude, as indeed two experts stated in describing

the level of treatment as inadequate under professional norms.[1]
But insufficient zeal for efficiency cannot be equated with
deliberate indifference, however much it may amount to negligence.
See Acosta v. U.S. Marshals Service, 445 F.3d 509, 514 (1st Cir.
2006) (§ 1983 liability attaches "only for constitutional
violations . . . and not for mere negligence").

Ramos next argues that the undisputed facts of treatment could
not reasonably be taken as evidence barring a finding of deliberate
indifference, for the very reason that all of Dr. Patnaude's
decisions made after he examined Ramos at the conclusion of the
first 3-day medication sequence were tainted by the belief that
Ramos was faking complaints about the continuing severity of his
reaction. But on its face, this belief is flatly inconsistent with
the required finding of subjective deliberate indifference to a
substantial risk, and there is nothing in the record that would
suggest the doctor was saying "fake" as a smokescreen for a
decision to let Ramos suffer whatever chance might bring his way.
To be sure, the undisputed facts indicate that the doctor
underestimated the risk; Ramos apparently presented an
unrepresentative case. But misjudgment, even negligent

---

[1]One expert also concluded that Dr. Patnaude's conduct amounted
to deliberate indifference. But this was a conclusion of mixed
fact and law, not a medical proposition that could qualify as fact
in applying the summary judgement evidentiary test. There is
moreover, no foundation to find that the expert had been instructed
on the elements of the deliberate indifference test, including its
subjective component.

misjudgment, is not deliberate indifference.

Finally, there is a more diffuse point that Ramos insists upon throughout his presentation to us: he was forced to subsist in pervasive filth during much or all of his stay at the House of Correction. One cannot read the descriptions he gives without feeling revulsion. But we see no point in parsing through Ramos's accounts of the conditions to determine which may be supported by evidence of fact beyond genuine dispute or subject to disputed claims that might be resolved in Ramos's favor, for we see no basis to treat them as material to the claim against Dr. Patnaude, who is sued for deliberate indifference to substantial medical risk of serious harm, not for inhumane sanitation in running the House of Correction. Which is not to deny that there is a point at which medical treatment requires attention to prison housing, but there is no claim of supervisory liability now in the case, and Ramos's responses to the summary judgment motion raise no basis for attributing to the doctor such subjective knowledge of cell conditions as might indicate deliberate indifference on his part in taking no steps to require improvement. One cannot infer anything beyond the undisputed record indication that any detoxification of a substantial drug user will involve vomiting and diarrhea.

We read the record just as the district court did.

**Affirmed.**